No. 96,681

STATE OF KANSAS, *Appellee*, v. RANDY J. JOHNSON, *Appellant.*
(190 P.3d 207)

Opinion filed August 1, 2008.

*Kari R. Nelson*, of Kansas Appellate Defender Office, argued the cause, and *Matthew J. Edge*, of the same office, was on the brief for appellant.

*Jared S. Maag*, deputy solicitor general, and *Ann L. Smith*, of Lenexa, argued the cause, and *Charles Branson*, district attorney, and *Paul J. Morrison*, attorney general, were with them on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Raising an issue of first impression, Randy J. Johnson argues his consecutive sentences for the longest prison term stated in a Kansas sentencing guidelines presumptive grid block are unconstitutional in light of the holding in *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007), which is based upon *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). He argues the only term which can constitutionally be applied is the middle term in the grid block because the factors justifying the longer term were not presented to the jury or proved beyond a reasonable doubt. We reject his argument because K.S.A. 21-4704(e)(1) does not require judicial fact-finding and grants a sentencing judge discretion to impose any of the three prison terms stated in the grid block. Consequently, Johnson's sentences are a statutorily and constitutionally permissible presumptive sentences which cannot be appealed. K.S.A. 21-4721(c)(1).

Before considering that question, we will address three challenges that Johnson presents as attacks on his convictions for four counts of attempted second-degree murder. We reject his argu-

ments and conclude: (1) The trial court did not abuse its discretion by admitting the testimony of the State's expert witness even though the witness violated discovery orders, (2) Johnson's statement to law enforcement officers was freely and voluntarily given, and (3) the issue whether Johnson was prejudiced by the introduction of witnesses' consistent statements prior to the testimony of the witnesses was not properly preserved for appeal because there was no contemporaneous objection.

Finally, Johnson raises an additional sentencing issue regarding whether the sentencing judge erred by ordering him to reimburse the State Board of Indigents' Defense Services (BIDS) for attorney fees without first considering his ability to pay and the financial burden the payment will impose. Because the judge failed to make specific findings as required by K.S.A. 22-4513 and *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006), we vacate the attorney fees order and remand for appropriate findings.

### Facts

On December 21, 2004, Johnson and two companions attended a party at the Boardwalk Apartments in Lawrence. As Johnson and his companions left the party and exited the apartment building, four individuals on a second-floor balcony confronted them about noise from the party. Johnson and one of his companions stood near the apartment building and argued with those people on the balcony. As the arguing escalated, Johnson pulled out a gun and shot toward the balcony, injuring three people. After the shots were fired, Johnson and his companions jumped in a car and, as they drove off, Johnson admitted, "My fault, dog."

Officers, who had a description of the car and the car's license tag number, stopped Johnson and the others just a few blocks from the crime scene and ordered them out of the car. Johnson exited the passenger side of the back seat by sliding onto the ground. He was handcuffed and patted down for weapons. When officers rolled Johnson onto his side, they saw a brass shell casing lying on the ground under him. Officers searched the car's interior and found a revolver and five spent brass shell casings. Subsequently, a bal-

listics test linked the revolver to two bullets recovered at the apartment complex.

The arresting officers noticed that Johnson smelled of alcohol and was unsteady on his feet; additionally, his speech was slurred, garbled, and difficult to understand. It was explained at trial that Johnson had smoked marijuana and consumed a significant quantity of beer and brandy.

Officers decided not to interview Johnson "because of his impaired state" and moved him to the jail for the night. The next morning, two detectives went to the jail to interrogate Johnson. Detective Warren Burket testified that there was no indication that Johnson would have trouble understanding their questions. After being given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966), Johnson gave a chronological description of the previous evening's events. He admitted that the gun in the car belonged to him and that he had fired it to protect one of his companions and to scare the individuals on the apartment complex balcony.

The State ultimately charged Johnson with four counts of attempted second-degree murder. Before trial the defense filed several motions to suppress Johnson's statements; all were denied. Consequently, at trial, a detective testified regarding his statements, including his admission that he was the shooter. In addition, there was other evidence linking Johnson to the shooting, including his admission to his companions, testimony of several eyewitnesses who identified him as the shooter, and ballistics tests that linked his gun to the shooting.

With no dispute regarding identity, the focal point of the trial was Johnson's defense of mental disease or defect. Defense counsel hired an expert witness, psychologist David Mouille, Ph.D., to examine Johnson. To counter, the State also retained an expert witness, psychologist Gerald Vandenberg, Ph.D. After the experts examined Johnson, the defense objected to the endorsement of Dr. Vandenberg and filed motions seeking to exclude his testimony because Dr. Vandenberg had violated discovery orders. The trial court allowed Dr. Vandenberg to testify.

The experts agreed that Johnson's intellectual capabilities were limited but disagreed as to whether Johnson had a mental disease or defect that prevented him from forming intent. To measure Johnson's intellectual capabilities, Dr. Mouille conducted I.Q. testing on Johnson, which Dr. Vandenberg "borrowed." Thus, the undisputed evidence established that Johnson's overall I.Q. is 80, which falls at the "cusp of the low average range, 80 to 89."

After conducting interviews with Johnson and performing several standardized psychological tests, Dr. Mouille concluded Johnson probably had suffered a brain injury, a conclusion he felt was supported by Johnson's mother who reported that her son twice suffered some type of injury as a young child. In addition, Dr. Mouille rated Johnson's adaptive behavior age at 3 and ½ years and his maturational age level below 10 years of age. Ultimately, Dr. Mouille opined Johnson has a mental disease or defect which, when combined with Johnson's intoxication on the night of the shootings, impaired Johnson to the point he could not form specific intent. His written report described Johnson's behavior as a "thoughtless response to the stressors in his environment."

The State's expert, Dr. Vandenberg, disagreed with these conclusions. He hypothesized Johnson had a learning disability and disputed Dr. Mouille's conclusion that Johnson suffered from brain damage. Additionally, he described Dr. Mouille's conclusion regarding Johnson's developmental and maturational age as "absurd" and totally contradictory to Johnson's history and to Dr. Vandenberg's observations of Johnson. Nevertheless, Dr. Vandenberg indicated Johnson is immature for his age; although Johnson was 20 years old at the time of the trial, Dr. Vandenberg rated his functional maturity at lower than age 19. In Dr. Vandenberg's opinion, these factors, combined with his intoxication, compromised Johnson's judgment but did not negate his ability to form intent.

The jury found Johnson guilty of four counts of attempted second-degree murder, severity level 3 person felonies. Johnson had no prior criminal history; thus, he was assigned a criminal history score of I. The applicable grid block for each conviction indicated a prison sentence of 55, 59, or 61 months. See K.S.A. 21-4704. Noting that a random shooting at an apartment complex could

result in several deaths, the judge sentenced Johnson to 61 months for each conviction to be served consecutively; however, because of the limitation of K.S.A. 21-4720(b)(4), the total prison sentence was limited to twice the base sentence, *i.e.*, 122 months. Johnson was also ordered to pay court costs and restitution.

Johnson makes a timely appeal. This case was transferred to this court on our own motion because of the issue of first impression raised by the United States Supreme Court's decision in *Cunningham*, 549 U.S. 270.

State's Experts

As his first issue on appeal, Johnson contends the trial court denied his right to a fair trial by allowing Dr. Vandenberg to testify regarding his mental evaluation after Dr. Vandenberg violated discovery orders entered by the trial court. The State counters that the court correctly allowed Dr. Vandenberg to testify; regardless, any error was harmless because Johnson was not prejudiced.

*Factual Background*

There is no dispute that Dr. Vandenberg violated a discovery order, which had been agreed upon by the parties. In the order, the trial court required that "[a]ny interviews or conversations with the Defendant by any professional retained by the State to perform a psychological assessment of the Defendant shall be tape recorded." Although Dr. Vandenberg was aware of the order, he recorded only portions of his interview with Johnson. Based on this violation, the defense objected to the State's motion to endorse Dr. Vandenberg and sought to exclude his testimony as a sanction.

At hearings on the defense objections and motions, Dr. Vandenberg testified he believed copyright laws prohibited him from recording standardized test questions because, in doing so, he would be placing those questions into the public domain. In addition, he believed "ethically, I cannot tape-record any kind of an examination without permission of the examinee." While Dr. Vandenberg "thought" he had apprised the prosecutor that he could not record that portion of Johnson's interview, he was "[n]ot entirely sure," and, indeed, the prosecutor advised the court that Dr.

Vandenberg did not tell him about the decision to record only portions of the interview.

In ruling on the various motions, the court expressed concern about why Dr. Vandenberg had "the [recorder] off when he indicated [Johnson] made certain substantive questions that would assist the State in showing that [he] knew what was going on." However, the court stated, "it's an impeachment issue" and "also a contempt issue," noting that Dr. Vandenberg "should have gotten the court's permission to not do something when he was ordered to tape, and that was an agreement that the two [parties] have reached."

Specifically addressing the State's motion to endorse, the court commented that a denial of such a motion is not typically ordered for the purpose of issuing a sanction—instead the question of whether to grant a motion to endorse involves "a question of prejudice." The court offered to entertain a recess or "maybe even a continuance of the trial" but, after observing that defense counsel made no such request, found that defense counsel had ample opportunity to examine the materials and prepare for cross-examination and was not prejudiced by the endorsement.

Later, defense counsel filed a motion requesting that the court prohibit the admission of Dr. Vandenberg's testimony or written report at trial as a sanction for violating the court's order. After the defense rested and the State was preparing to call Dr. Vandenberg as a rebuttal witness, the motion was addressed outside the presence of the jury. The trial court denied the motion, noting that defense counsel had been able to question Dr. Vandenberg at a previous suppression hearing and had asked questions regarding the unrecorded portions of the interview. Again, the court reiterated that the defense would be able to impeach the witness regarding the failure to comply with the court order.

At trial, defense counsel vigorously cross-examined Dr. Vandenberg regarding his conclusions, asking him about specific questions on the standardized tests. In addition, defense counsel thoroughly cross-examined Dr. Vandenberg about his decision to shut off the tape recorder. As the trial court predicted, these questions highlighted Dr. Vandenberg's potential bias toward the State.

After the trial, the court found Dr. Vandenberg to be in indirect contempt of court. In doing so, the court made additional findings that explained its view of Dr. Vandenberg's conduct, noting Dr. Vandenberg "conducted the evaluation and turned off the tape recorder, an intentional act, during a small part of the evaluation. This was a clear violation of the court's order." Nevertheless, the court did not believe Dr. Vandenberg's motives were "sinister." But the court felt the matter was serious and ordered Dr. Vandenberg (1) to pay the attorney fees associated with the contempt proceeding and (2) to seek direction or decline cases in the future if he does not believe he can comply with a court order.

On appeal, Johnson argues the trial court should have done more and should have excluded Dr. Vandenberg's testimony because, although Johnson was present during the psychiatric examination, defense counsel had no independent means of determining what occurred during the unrecorded portions of the examination and was forced to rely on Dr. Vandenberg's own recollection.

*Was it error to allow Dr. Vandenberg to testify?*

The parties disagree on the appropriate standard for appellate review of the trial court's decision to allow Dr. Vandenberg's testimony. The State argues we should apply an abuse of discretion standard; the defense urges a de novo standard.

Generally, the admission of expert testimony lies within the sound discretion of the trial court, and its decision will not be overturned absent an abuse of such discretion. *State v. Corbett*, 281 Kan. 294, 317, 130 P.3d 1179 (2006); *State v. Holmes*, 278 Kan. 603, 623, 102 P.3d 406 (2004); *State v. Brice*, 276 Kan. 758, 775, 80 P.3d 1113 (2003). Here, no question is raised regarding the typical issues surrounding the admission of expert testimony; there is no question regarding Dr. Vandenberg's qualifications, the relevancy of his opinion, or Dr. Vandenberg's ability to assist the jury in understanding technical facts or material evidence. See K.S.A. 60-456(b), (d); *State v. Struzik*, 269 Kan. 95, Syl. ¶ 3, 5 P.3d 502 (2000). Rather, the sole question is whether the trial court should have excluded the testimony as a sanction for the discovery order violations.

K.S.A. 22-3212(g) authorizes a broad array of sanctions for violations of discovery orders in criminal cases, including permitting the discovery or inspection of materials not previously disclosed, granting a continuance, prohibiting the party from introducing into evidence the material not disclosed, or entering "such other order as [the court] deems just under the circumstances." By granting the option to impose sanctions the trial court deems "just," the provision grants discretion to determine the appropriate sanction. Consequently, a trial court's denial of a motion seeking to exclude the testimony of a witness who violated a discovery order in a criminal case is reviewed under an abuse of discretion standard if due process rights are not implicated by the violation. See *Pierce v. Underwood*, 487 U.S. 552, 559, 101 L. Ed. 2d 490, 108 S. Ct. 2541(1988) ("language and structure of the governing statute" may determine standard of review).

Johnson argues, however, that we should apply a de novo standard because his due process rights are implicated. Yet Johnson fails to cite any authority to support his contention, and we cannot find a basis for such a conclusion. A criminal defendant does not have a due process right to have expert witnesses record interviews. It was entirely within the trial court's discretion to order the recording of the interview or to allow the interview to be conducted without a recording. Nor is there a due process right to have testimony excluded when the witness or a party violates a discovery order because K.S.A. 22-3212(g) grants discretion to the trial court to determine the "just" sanction. Such a sanction could take many forms other than suppression of the evidence. Consequently, a due process interest did not arise. See *Robinson*, 281 Kan. at 547 ("A due process violation can be established only if a claimant is able to show that he or she was denied a specific procedural protection to which he or she was entitled.").

Additionally, although an accused has a due process right to a fair trial, due process does not guarantee a perfect trial. See *State v. Lumley*, 266 Kan. 939, 962, 976 P.2d 486 (1999); *United States v. Stevens*, 612 F.2d 1226, 1229-30 (10th Cir. 1979). The lack of a recording of a small portion of the interview, even if a recording was ordered by the court, did not deprive Johnson of a fair trial.

Johnson was left in the same situation as many criminal defendants where interviews are not recorded, except he was able to impeach Dr. Vandenberg regarding his failure to follow the court order. Moreover, Johnson was able to present his defense.

Therefore, we conclude that if a witness violates a discovery order in a manner that does not implicate due process, an abuse of discretion standard governs appellate review of a trial court's decision to admit the witness' testimony rather than to exclude the testimony as a sanction permitted by K.S.A. 22-3212(g). Under the facts of this case, we reject Johnson's argument that discretion was abused by denying the motion to exclude Dr. Vandenberg's testimony. While Dr. Vandenberg did not fully comply with the court order, the record shows that defense counsel was able to thoroughly cross-examine him regarding his professional opinion of Johnson's mental capacity and his methods for evaluating Johnson. Also, the record reflects that Dr. Vandenberg relied largely on data provided by the defense expert, Dr. Mouille, in rendering his opinion. Dr. Vandenberg testified that he repeated tests only to the extent of double checking the accuracy of Dr. Mouille's conclusions, and the trial court found this was only a small portion of the interview. Moreover, the violation of the order potentially diminished the weight of Dr. Vandenberg's expert testimony. The trial court struck an appropriate balance by ordering sanctions but allowing the testimony.

Thus, the trial court did not abuse its discretion in admitting Dr. Vandenberg's expert opinion testimony regarding Johnson's mental capacity.

### Confession

Johnson filed three pretrial motions to suppress his statements to officers, all of which were denied. On appeal, Johnson reiterates that his state of intoxication, combined with his limited intellectual capacity, rendered his statements to officers involuntary. More specifically, Johnson contends that he did not understand his right to remain silent.

*Factual Background*

Drs. Mouille and Vandenberg were also asked to evaluate whether Johnson was able to understand his right to remain silent.

At hearings on the various motions to suppress, the trial court heard testimony regarding their contradictory opinions. Dr. Mouille opined that Johnson understood his right to counsel but believed he was required to talk to the detectives. Dr. Vandenberg, on the other hand, concluded that Johnson had the capacity to understand the *Miranda* warnings. Dr. Vandenberg's opinion was buttressed by the fact that Johnson initially refused to participate in the psychiatric interview until Johnson had spoken to his attorney. This postponed Dr. Vandenberg's interview until the following day.

The court also considered the preliminary hearing testimony of Detective Burket, one of two detectives who interviewed Johnson. Detective Burket indicated that after allowing Johnson to sleep overnight in the local jail because of concern about his being inebriated, he and Detective Mike Schneider interviewed Johnson the next morning at about 10:45 a.m. Because Johnson had just woken up, the detectives ordered a tray of food for him. The detectives were dressed in plain clothes, and neither had a weapon.

The detectives told Johnson they had talked to "a lot of witnesses, including people that were in his vehicle with him" and knew he fired the gun. They indicated they had one side of the story and wanted to hear his side. Then, they asked if he would be willing to talk to them, and Johnson agreed. Next, Johnson was read his rights per *Miranda* and waived them. Before Johnson signed a waiver, the detectives explained that he did not have to do so if he did not want to. Johnson also agreed to give a written statement.

Detective Burket testified that Johnson spoke appropriately, made sense, and was cooperative and polite. The detective denied having any concerns about Johnson remaining under the influence of alcohol or some other substance. In addition, Detective Burket denied making any threats or promises to Johnson.

Johnson told the detectives about the chronology of events on the night of the shooting and also explained he shot the gun to protect one of his companions and to scare the individuals on the balcony in an attempt to let them know not to "mess" with him.

At the conclusion of the oral interview, the detectives asked Johnson for his written statement. They inquired about his level of education, to which Johnson replied that he did not graduate from high school but passed a "life skills course." Detective Burket once again read the *Miranda* rights, which were listed on the form, and explained to Johnson that "it was the same as before only for a written statement." Johnson signed the form, and the detectives stepped out of the room while he completed his statement for 15 to 20 minutes.

Then, around 1:30 p.m., after Johnson had completed his written statement, a tape recorder was delivered. Detective Burket asked Johnson if he would submit to a recorded interview. The detective started the recorder, but Johnson said at the very beginning of the recorded statement that he wanted an attorney. Therefore, the detective immediately terminated the interview.

Based upon the evidence, the trial court found that Johnson was of low average intelligence but was "certainly quite a functioning individual" and "was able to make decisions." Although the court acknowledged Dr. Mouille's testimony regarding Johnson's understanding his right to have an attorney versus his right to remain silent, the court failed to see the distinction the defense tried to draw between these two concepts. The judge stated: "I think there is some dovetailing involved in these particular matters." The court observed that after a period of time during the interview, Johnson told the detectives he "did not want to talk to [them] anymore. He asked for an attorney."

Looking at the totality of the circumstances and testimony, the court found the State showed by a preponderance of the evidence that Johnson's "statements made to the police officers were voluntary, were not in violation of *Miranda*."

*Was it error to admit Johnson's statements?*

In reviewing a trial court's decision regarding suppression, this court reviews the factual underpinnings of the decision by a substantial competent evidence standard and the ultimate legal conclusion by a de novo standard, applying independent judgment. This court does not reweigh evidence, pass on the credibility of

witnesses, or resolve conflicts in the evidence. *State v. Harris*, 284 Kan. 560, Syl. ¶ 9, 162 P.3d 28 (2007); *State v. Ackward*, 281 Kan. 2, Syl. ¶ 1, 128 P.3d 382 (2006).

It is well established that voluntariness of a confession must be determined under the totality of the circumstances. The State has the burden of proving that a confession is admissible, and the required proof is by a preponderance of the evidence. The essential inquiry is whether the statement was the product of the accused's free and independent will. *State v. Brown*, 285 Kan. 261, 272, 173 P.3d 612 (2007); *State v. Gonzalez*, 282 Kan. 73, 103, 145 P.3d 18 (2006). Numerous factors are to be considered when determining if a statement was voluntary, which this court has consolidated into the following nonexclusive list based on previous Kansas case law:

"(1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language." *State v. Walker*, 283 Kan. 587, 596-97, 153 P.3d 1257 (2007).

In this case, the defense focuses upon the accused's mental condition and intellect. No other factor weighs against a conclusion that Johnson's waiver of rights was voluntary, and the absence of other factors is an important consideration. This point was emphasized in *State v. Swanigan*, 279 Kan. 18, 30-39, 106 P.3d 39 (2005), a case in which the defendant had an I.Q. of 76. In that case the defendant relied upon several factors, causing this court to note:

"Although any one of these factors which Swanigan asserts—his low intellect and susceptibility to being overcome by anxiety, the officers' repeated use of false information, and their threats and promises—may not be sufficient to show coercion, the combination of all of them in this case leads us to conclude as a matter of law that Swanigan's October 31 statement was not the result of his free will, but was involuntary." 279 Kan at 39.

In contrast, when low intellect is the only factor, in several cases this court has concluded the statement is knowing and voluntary. For example, in *State v. Thompson*, 221 Kan. 165, 558 P.2d 1079 (1976), the defendant alleged that he was incapable of voluntarily and intelligently waiving his right to remain silent due to the fact that he had an I.Q. of 68. In affirming the trial court's determi-

nation that the statement was freely, voluntarily, and intelligently given, the *Thompson* court stated that "[t]he mental deficiencies of the defendant may be an important factor in determining whether or not a confession was voluntarily given. That fact alone, however, is not conclusive evidence on the issue." 221 Kan. at 170; see also *Colorado v. Connelly*, 479 U.S. 157, 163-65, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986) (low intellect not basis for finding statement involuntary if no coercion); *State v. Mays*, 277 Kan. 359, 374-76, 85 P.3d 1208 (2004) (verbal I.Q. of 77 was only one factor); *State v. Lane*, 262 Kan. 373, 386, 940 P.2d 422 (1997) (I.Q. of 77 was only one factor); see generally Annot., 8 A.L.R.4th 16.

In other words, Johnson's low intelligence does not preclude a finding that Johnson knowingly and voluntarily waived his *Miranda* rights. The waiver may be knowing, as defined by constitutional requirements, if the circumstances indicate Johnson understood his constitutional rights and the consequences of asserting or waiving those rights. Further, Johnson's waiver of rights may be voluntary if law enforcement officers did not exploit his low intelligence or otherwise coerce the waiver. See *Connelly*, 479 U.S. at 163-65; *Holloway v. State*, 561 So. 2d 1119, 1121-23 (Ala. Crim. App. 1990); *Harjo v. State*, 882 P.2d 1067, 1071-72 (Okla. Crim. 1994).

Regarding Johnson's knowing waiver of rights, the conflicting expert opinions regarding his general ability to understand his rights must be weighed by the trier of fact. *State v. Kuykendall*, 264 Kan. 647, 651, 957 P.2d 1112 (1998) ("It is the function of the jury in a criminal case to determine the weight and credit to be given the testimony of each witness, whether expert or lay in nature."); see *Holloway*, 561 So. 2d at 1123 (State's experts contradicted the defense experts. "This presented a conflict in the evidence, which only the finder of fact could resolve."). Here, the trial court resolved the conflict in favor of the State.

In addition, there is other evidence that supports the trial court's findings regarding Johnson's capacity to understand. The circumstances demonstrate that Johnson was aware of his right to remain silent. As the trial court pointed out, when Johnson asked for an attorney he effectively asserted his right to remain silent. Then,

when Dr. Vandenberg attempted to interview Johnson, he again refused to speak without consulting with his attorney. Even though he only asserted a right to counsel, he did so because he no longer wanted to speak to the detectives or the State's expert without an attorney present, indicating he understood he was not required to answer their questions.

Also, there was no indication at any point in the interviews that Johnson did not understand the conversation. His responses were coherent, he was able to provide a chronological recitation of events, and he asserted a possible defense, *i.e.*, defense of another. Johnson was twice read his rights, indicated he understood them, and agreed to speak with the detectives and to write a confession. The totality of these circumstances indicates Johnson was functioning at a level sufficient to understand his rights and to understand the consequences of waiving those rights. Moreover, he was capable of making a decision to waive his rights or, as he did on two occasions, assert them.

Regarding voluntariness, as the United States Supreme Court has held, a mental deficiency in the defendant that is not exploited by law enforcement officers does not annul the voluntariness of a confession unless there is evidence of coercion. *Connelly,* 479 U.S. at 164-65; compare *Swanigan,* 279 Kan. at 39 (low intellect combined with coercive factors rendered statements involuntary). The record does not suggest that the detectives took advantage of Johnson's intelligence level, that he was in any way subjected to coercion or improper conduct, or that Johnson's statements were the result of confusion or mental deficiency.

The trial court's factual findings are supported by substantial competent evidence, and our independent review affirms the conclusion the statements were knowingly and voluntarily made. The trial court did not err in denying the various motions to suppress and in admitting Johnson's statements to the detectives.

## Prior Consistent Statements

Next, Johnson contends the trial court abused its discretion by allowing law enforcement officers to testify about what witnesses

told them before those witnesses testified. The statements made to the officers were consistent with the witnesses' trial testimony.

At the outset, Johnson acknowledges that he did not object to the admission of these prior consistent statements. Generally, a timely and specific objection for the admission of evidence is necessary to preserve the issue for appeal. See K.S.A. 60-404. Thus, even if constitutional grounds for inadmissibility are asserted, the issue is not properly before this court for review if raised for the first time on appeal. *State v. Gaudina*, 284 Kan. 354, 372, 160 P.3d 854 (2007); *Gonzalez*, 282 Kan. at 114.

A recognized exception to that general rule applies when consideration of the newly asserted claim is necessary to serve the ends of justice or to prevent a denial of fundamental rights. *State v. Moody*, 282 Kan. 181, 192, 144 P.3d 612 (2006); *State v. Williams*, 275 Kan. 284, 288-89, 64 P.3d 353 (2003). Johnson urges us to apply this exception. We reject this invitation because the criteria for applying the exception are not met.

Granted, a violation of the right to confront witnesses can occur if a statement is admitted and the witness is not called to testify. *See State v. Hernandez*, 284 Kan. 74, 97-98, 159 P.3d 950 (2007); *State v. Fisher*, 222 Kan. 76, 82, 563 P.2d 1012 (1977). Here, however, the State did call the witnesses, and Johnson was able to cross-examine them regarding their statements.

With no constitutional issue implicated, Johnson's argument is one of prejudice, *i.e.*, he argues that admitting the consistent statement unduly bolstered the witnesses' credibility. Indeed, when a defendant has not been deprived of his or her right to cross-examine a witness, courts generally frame the issue as being whether the prejudicial impact of the testimony outweighs its probative value. *E.g., United States v. Green*, 258 F.3d 683, 692 (7th Cir. 2001) (abandoning a contrary rule and joining its "sister circuits," and holding that "[Federal] Rule [of Evidence] 801[d][1][B] does not bar the introduction of a prior consistent statement through the testimony of someone other than the declarant, so long as the declarant is available for cross-examination about the statement at some time during the trial"); *Ross v. Saint Augustine's College*, 103 F.3d 338, 341-42 (4th Cir. 1996) (no error to allow plaintiff to

admit her consistent statements prior to her testimony; evidence was linked up to later impeachment efforts by defendant when she did testify; court distinguished *United States v. Bolick*, 917 F.2d 135, 138-39 [4th Cir. 1990], where the government pursued a deliberate strategy of attempting to minimize the unpalatability of its witnesses by first admitting their statements through a federal agent); *Thompson v. State*, 769 P.2d 997, 1002 (Alaska App. 1989) (premature admission of victim's prior consistent statements creates the danger that jury may accept witness' view of victim's credibility before victim testifies); *People v. Sommerville*, 193 Ill. App. 3d 161, 176, 549 N.E.2d 1315 (1990) (testimony of three witnesses regarding victim's prior consistent statements constituted reversible error where evidence was close); *Modesitt v. State*, 578 N.E.2d 649, 651-52 (Ind. 1991) (drumbeat repetition of victim's original story prior to calling victim to testify did unduly prejudice the jury).

An argument based upon potential prejudice does not erase the need for a contemporaneous objection; in fact, it highlights the policies underlying the rule. The contemporaneous objection rule is designed to give the trial court the opportunity to correct or avoid error. *State v. Boyd*, 257 Kan. 82, 89, 891 P.2d 358 (1995). Additionally, as applicable to this case, the trial court is in a better position to weigh the probative versus prejudicial value of evidence. See, *e.g., State v. Garcia*, 285 Kan. 1, 18-19, 169 P.3d 1069 (2007). Therefore, it is inappropriate for this weighing to occur for the first time on appeal.

Because Johnson did not object to the admission of testimony regarding witnesses' prior consistent statements and has not shown his due process rights were implicated, he failed to preserve an argument for appeal regarding a claim the evidence was prejudicial.

## *Cunningham v. California*

Turning to sentencing issues, Johnson contends K.S.A. 21-4704(e)(1) violates the Sixth and Fourteenth Amendments to the United States Constitution. He argues the sentencing judge was required to impose the middle term within the presumptive grid block, unless the judge stated aggravating factors on the record for

imposing the longer sentence. Based upon *Cunningham v. California*, 549 U.S. 270, 166 L. Ed. 2d 856, 127 S. Ct. 856 (2007), he further argues the maximum sentence that the statute authorizes for his convictions is the middle term in the sentencing block and any factors that would increase a sentence beyond that middle term must be submitted to a jury and determined beyond a reasonable doubt. Thus, Johnson claims he was given illegal sentences and requests his case be remanded for resentencing.

The State counters that the Kansas sentencing guidelines give a sentencing judge discretion to impose any term within the presumptive range found in a particular grid block, distinguishing K.S.A. 21-4704 from the provisions of the California penal code that were ruled unconstitutional in *Cunningham*.

*Appellate Jurisdiction*

Although the parties do not discuss this court's jurisdiction to consider this issue, an appellate court has a duty to question jurisdiction on its own initiative. If the record shows there is no jurisdiction for the appeal, the appeal must be dismissed. *State v. Harp*, 283 Kan. 740, 746, 156 P.3d 1268 (2007). To make this determination, appellate courts must examine the governing statutes because the right to appeal is statutory; neither the United States nor Kansas Constitutions grant such a right. *State v. Flynn*, 274 Kan. 473, 477, 55 P.3d 324 (2002).

The Kansas Sentencing Guidelines Act (KSGA), K.S.A. 21-4701 *et seq.*, defines Johnson's right to appeal from his sentences and, as applicable to this issue, provides that "the appellate court shall not review: (1) Any sentence that is within the presumptive sentence for the crime." K.S.A 21-4721(c)(1). KSGA defines "presumptive sentence" as "the sentence provided in a grid block for an offender classified in that grid block by the combined effect of the crime severity ranking of the current crime of conviction and the offender's criminal history." K.S.A. 21-4703(q). Johnson's sentences were provided in the grid block applicable to his crimes of conviction and his criminal history, which stated terms of 55, 59, and 61 months. The sentencing judge chose to impose consecutive 61-month presumptive sentences.

Nevertheless, although not phrased in terms of the jurisdictional issue, the essence of Johnson's argument is that any sentence that applies aggravating factors cannot be considered a standard—or in KSGA terminology a "presumptive"—sentence because constitutionally a jury must consider and determine the aggravating factors.

Under similar circumstances, when defendants have attacked the constitutionality of a sentencing statute in light of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and its progeny (which now includes *Cunningham*, 549 U.S. 270), this court has considered the constitutional attack on direct appeal, even if the defendant received a presumptive sentence. In each case, however, the court framed the issue as a determination of whether the court had jurisdiction to review the sentence. Upon finding that the sentencing scheme at issue did not offend constitutional principles and, therefore, could be considered a presumptive sentence, the court determined appellate courts lacked jurisdiction over the issue. *State v. Bramlett*, 273 Kan. 67, 67-68, 41 P.3d 796 (2002) (consecutive sentences do not violate *Apprendi*; "appellate courts are without jurisdiction to review sentences that are within the presumptive range for the crime," citing K.S.A. 21-4721[c][1]); *State v. Ivory*, 273 Kan. 44, 41 P.3d 781 (2002) (*Apprendi* does not require criminal history be proven to jury; sentence within presumptive range was not subject to challenge on appeal).

As in these cases, we conclude a sentence that falls within a grid block is constitutional and may be considered a presumptive sentence, and appellate courts lack jurisdiction.

## Standard of Review

To reach this determination, we apply an unlimited scope of review. Construction of the KSGA and determination of the constitutionality of its provisions are questions of law. *State v. Davis*, 275 Kan. 107, 124, 61 P.3d 701 (2003); *Ivory*, 273 Kan. at 46.

This court has explained that "a statute is presumed constitutional and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the con-

stitution before it may be struck down. [Citation omitted.]" *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). In applying these rules, this court "not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute." *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174, *cert. denied* 492 U.S. 923 (1989).

*Apprendi to Cunningham*

The *Apprendi* to *Cunningham* line of cases apply the Sixth Amendment to the United States Constitution, made applicable to the States by way of the Fourteenth Amendment, and its guarantee of the right to a jury trial in all criminal prosecutions. In *Apprendi*, the United States Supreme Court interpreted the Sixth Amendment to apply to the sentencing phase and to require that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

At issue in *Apprendi* was the constitutionality of a New Jersey hate crime statute that permitted a sentence enhancement beyond the standard sentencing range if the court found by a preponderance of the evidence that the defendant committed the offense for which he or she was convicted for the purpose of intimidation based on race, color, gender, handicap, religion, sexual orientation, or ethnicity. The New Jersey court had found that Apprendi had acted with the intent to intimidate based on race and, thus, had enhanced his sentence according to the statute. Under its analysis, the United States Supreme Court held that the New Jersey statute was unconstitutional because it allowed (1) a judge (not a jury) (2) to impose an increased sentence (3) based on its finding of a particular fact (the intent to intimidate based on one of the listed factors) by a lower legal standard. 530 U.S. at 490, 496-97.

As we apply the analysis in *Apprendi*, "the relevant inquiry [to determine the constitutionality of a sentencing scheme] is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's

guilty verdict?" 530 U.S. at 494. If so, the statute is unconstitutional under *Apprendi's* reasoning.

This court considered the scope of the *Apprendi* decision in *State v. Gould*, 271 Kan. 394, 23 P.3d 801 (2001). In that case, the court reviewed the constitutionality of K.S.A. 2000 Supp. 21-4716, which allowed for an upward durational sentencing departure if certain aggravating factors were found by the sentencing judge. Examining the facts, the *Gould* court found that "Gould's jury verdict 'authorized' a sentence of 31 to 34 months for each child abuse conviction. By imposing two 68-month sentences, the sentencing judge went beyond the maximum sentence in the applicable grid block and exposed Gould to punishment greater than that authorized by the jury's verdict." 271 Kan. at 410-11. This court held that, under the Sixth and Fourteenth Amendments to the United States Constitution, a "judge may not impose a more severe sentence than the maximum sentence authorized by the facts found by the jury"; thus, K.S.A. 2000 Supp. 21-4716 was held "unconstitutional on its face." 271 Kan. 394, Syl. ¶ ¶ 3, 4.

In contrast, in this court's later decision in *Bramlett*, 273 Kan. 67, the defendant, like Johnson, was sentenced to the highest term in the grid block. He did not question the constitutionality of that determination but did challenge whether imposing consecutive sentences on multiple counts increased the sentences beyond that authorized by the jury. This argument was rejected, with the *Bramlett* court concluding, "[I]t cannot be said that, as to any individual count, the court's findings resulted in the imposition of a greater punishment than was authorized by the jury's verdict." 273 Kan. at 70.

In both *Gould* and *Bramlett*, we emphasized that the jury verdicts authorized the imposition of presumptive sentences, which are defined as any of the three terms in the applicable grid block. After these decisions, however, the United States Supreme Court decided three additional cases that focused upon the impact of *Apprendi* when a sentencing statute authorized a range of sentences for a particular conviction. We must determine whether these decisions require us to alter our conclusion it is the jury verdict that authorizes the imposition of presumptive sentences.

First, in *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004), the Court determined there was a violation of Blakely's Sixth Amendment right to a jury trial when the judge imposed a sentence of 90 months for Blakely's class B felony rather than the "standard range" of 49 to 53 months provided by Washington's Sentencing Reform Act. The law provided that the judge, without a jury, "may impose a sentence above the standard range" if the judge finds " 'substantial and compelling reasons justifying an exceptional sentence.' " 542 U.S. at 299. The Washington law included a nonexhaustive list of aggravating facts upon which a court could increase a sentence above the standard range.

In striking down Washington's provision for exceptional sentencing, the *Blakely* Court emphasized that the relevant " 'statutory maximum' " for purposes of the Sixth Amendment and *Apprendi* "is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. [Citations omitted.]" 542 U.S. at 303. "In other words," said the Court, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." 542 U.S. at 303-04. Because Blakely's sentence was increased above the prescribed standard range based upon the judge's finding of deliberate cruelty, a fact that was neither admitted by Blakely nor found by a jury, the statutory scheme for exceptional sentencing violated Blakely's Sixth Amendment right to trial by jury. 542 U.S. at 313-14.

Less that 6 months later, in *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005), the Supreme Court held that the federal sentencing guidelines, as written, violated the Sixth Amendment to the United States Constitution because, like the Washington sentencing scheme addressed in *Blakely*, the federal "sentencing rules are mandatory and impose binding requirements on all sentencing judges." 543 U.S. at 233. The *Booker* Court observed:

"If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sen-

tences in response to differing sets of facts, their use would not implicate the Sixth Amendment. We have never doubted the authority of a judge to exercise broad discretion in imposing a sentence within a statutory range. [Citations omitted.] Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act] the provisions that make the Guidelines binding on district judges . . . . [W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." 543 U.S. at 233 (Stevens, J., opinion of the Court in part).

As a remedy, the Court excised the provisions that made the federal guidelines mandatory. This had the effect of making the federal guidelines advisory only. 543 U.S. at 245-46 (Breyer, J., opinion of the Court in part).

In the third case, *Cunningham*, 549 U.S. 270, the defendant challenged California's determinate sentencing law (DSL). The applicable provisions of the DSL provided that Cunningham's offense was punishable by a lower-term sentence of 6 years, a middle-term sentence of 12 years, or an upper-term sentence of 16 years. See Cal. Penal Code Ann. § 288.5(a) (West 1999) (Penal Code). During Cunningham's sentencing hearing, the judge found six additional aggravating factors by a preponderance of the evidence and sentenced the defendant to the upper term authorized by Penal Code § 288.5(a)—16 years in prison.

The sentencing judge's decision as to which of the three sentences it should apply was governed by Penal Code § 1170(b) (West Supp. 2006), and the corresponding rules adopted by California's Judicial Council. Section 1170(b) provided that " 'the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime.' " 549 U.S. at 277. The accompanying rules described the applicable aggravating circumstances to be considered as " 'facts which justify the imposition of the upper prison term' " and required that these facts " 'be established by a preponderance of the evidence' " and " 'stated orally on the record.' " 549 U.S. at 278 (quoting Judicial Council Rules 4.405[d], 4.420[b], and 4.420[e]). The majority again emphasized the fact-finding requirement in responding to Justice Alito's argument in dissent (549 U.S. at 307-08) that an aggravating

circumstance may reflect "a policy judgment, or even a judge's 'subjective belief' " rather than a fact. The majority rejected the argument because "California's Rules . . . constantly refer to 'facts.' " 549 U.S. at 279.

Summarizing the effect of the California statutes and rules, the *Cunningham* majority concluded the provisions "direct the sentencing court to start with the middle term, and to move from that term only when the court itself finds and places on the record facts—whether related to the offense or the offender—beyond the elements of the charged offense." 549 U.S. at 279. Under this procedure, the " 'statutory maximum' " sentence, as described by *Apprendi*, was actually the middle-term sentence in California's DSL—not the upper term applied by the sentencing judge in that case. 549 U.S. at 288. The Court reasoned that "an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance," and "[a]n element of the charged offense, essential to a jury's determination of guilt, or admitted in a defendant's guilty plea, does not qualify as such a circumstance." 549 U.S. at 288. Thus, the Court found that the DSL was facially unconstitutional. 549 U.S. at 288-89, 293.

In reaching this decision, the *Cunningham* Court relied heavily on its opinion in *Apprendi*, 530 U.S. 466, as well as its opinions in *Blakely*, 542 U.S. 296, and *Booker*, 543 U.S. 220. The Supreme Court specifically distinguished California's DSL from the now-advisory federal sentencing guidelines, which allow judges to impose any reasonable sentence within the statutory range, with or without additional findings. 549 U.S. at 291-92. The *Cunningham* Court reemphasized that in *Booker*, all justices agreed judicial fact-finding would be constitutionally permissible under an advisory sentencing system. 549 U.S. at 286-88, 291-92.

In contrast, the DSL was constitutionally infirm because the

"sentencing judge had no discretion to select a sentence within a range of 6 to 16 years. Her instruction was to select 12 years, nothing less and nothing more, unless she found facts allowing the imposition of a sentence of 6 or 16 years. Fact-finding to elevate a sentence from 12 to 16 years, our decisions make plain, falls within the province of the jury employing a beyond-a-reasonable-doubt standard, not the

bailiwick of a judge determining where the preponderance of the evidence lies." 549 U.S. at 292.

In reaching its holding, the *Cunningham* Court recognized, in a footnote, that Kansas is one of several states that have modified their systems in the wake of *Apprendi* and *Blakely* to retain determinate sentencing. 549 U.S. at 294 n.17. Other States have given their sentencing judges "genuinely" broad discretion to sentence within a sentencing range, which the Court stated "encounters no Sixth Amendment shoal." 549 U.S. at 294. Appearing to approve both types of modifications, the Court urged California to likewise alter its laws in some manner.

Ultimately, *Cunningham* does nothing more than reaffirm the holding of *Booker*, allowing a judge to sentence within a range if based upon an exercise of discretion rather than upon facts that must be found by the judge. See also *Rita v. United States*, 551 U.S. 338, 352-53, 168 L. Ed. 2d 203, 127 S. Ct. 2456 (2007) (explaining judicial fact-finding only violates Sixth Amendment if judge is forbidden from increasing defendant's sentence in the absence of the judge-found facts); *People v. Harper*, 479 Mich. 599, 739 N.W.2d 523 (2007) (declined to follow *Cunningham* on state law grounds; indeterminate sentencing scheme did not offend Sixth Amendment); *State v. Garner*, 177 P.3d 637, 643 (Utah App. 2008) (indeterminate sentencing scheme involving three ranges of sentences, with middle minimum term as default, did not run afoul of Sixth Amendment).

*KSGA*

Hence, the question is whether K.S.A. 21-4704(e)(1) permits a sentencing judge to exercise discretion in imposing any term within the presumptive range or whether the statute requires a judge to impose the middle term unless facts extraneous to the jury verdict are found to constitute aggravating circumstances. If the judge does not have discretion to impose the longer term without finding facts extraneous to the jury verdicts, Johnson's sentences are unconstitutional.

K.S.A. 21-4704(e)(1) states: "The sentencing court has discretion to sentence at any place within the sentencing range. The sen-

tencing judge shall select the center of the range in the usual case and reserve the upper and lower limits for aggravating and mitigating factors insufficient to warrant a departure."

There is an obvious ambiguity in this statute. While it provides that the sentencing judge "has *discretion* to sentence at any place within the sentencing range," it goes on to say that the "sentencing judge *shall select* the center of the range in the usual case." (Emphasis added.) K.S.A. 21-4704(e)(1). Despite the "shall" in the second sentence, the language connotes, overall, a wide latitude and not a mandatory requirement as seen in *Cunningham*, 549 U.S. at 275 (California law "obligated the trial judge to sentence Cunningham to the 12-year middle term unless the judge found one or more additional facts in aggravation."). We reach this conclusion based upon several indications of legislative intent. See *Winnebago Tribe of Nebraska v. Kline*, 283 Kan. 64, 77, 150 P.3d 892 (2007) ("The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained.").

One indication is that K.S.A. 21-4704(e)(1) does not require a sentencing judge to cite to an aggravating or mitigating fact when determining which presumptive sentence to impose. In contrast, the California provisions required fact-finding. In this regard the California provision more closely resembles K.S.A. 21-4716(a), which addresses departure sentences and contrasts those sentences with presumptive sentences, stating:

"Except as provided in subsection (b), the sentencing judge shall impose the presumptive sentence provided by the sentencing guidelines for crimes committed on or after July 1, 1993, unless the judge finds substantial and compelling reasons to impose a departure. If the sentencing judge departs from the presumptive sentence, the judge *shall state on the record* at the time of sentencing the substantial and compelling reasons for the departure." (Emphasis added.) K.S.A. 21-4716(a).

Contrasting the requirement for fact-finding in the departure procedure with the absence of similar language in K.S.A. 21-4704(e)(1) supports a conclusion that the legislature did not intend that specific findings must be placed on the record when the judge stays within the presumptive sentencing range, even if the longest term is imposed. Past cases recognize this intent, holding that there

is no requirement that a sentencing judge cite any specific factual circumstances when deciding to impose the maximum term within the applicable sentencing grid block. See *Pieplow v. State*, 31 Kan. App. 2d 998, 1000, 76 P.3d 1069, *rev. denied* 277 Kan. 925 (2003).

This same intent is reflected in the statutes allowing or restricting appeals from KSGA sentences. K.S.A. 21-4721(d) specifies that appellate courts may review departure sentences to determine "whether the sentencing court's findings of fact and reasons justifying a departure: (1) [a]re supported by the evidence in the record; and (2) constitute substantial and compelling reasons for departure." In contrast, presumptive sentences are not appealable. K.S.A. 21-4721(c)(1). The legislature's determination that there is no right to appeal a presumptive sentence indicates an intent to grant the sentencing judge unlimited discretion to impose any term within the presumptive grid block. See *Pieplow*, 31 Kan. App. 2d at 1000 ("It would make little sense to require a court to make specific findings on the record supporting a presumptive sentence when such a sentence is not subject to appellate review.").

In addition, even though the second sentence in the statute contains the word "shall," the context of that sentence and this court's opinions applying that statute indicate that the sentence is directory rather than mandatory. This court discussed its method for determining whether a statutory provision is mandatory or directory in *State v. Deavers*, 252 Kan. 149, 167, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993), noting:

"Factors which would indicate that the provisions of a statute or ordinance are mandatory are: (1) the presence of negative words requiring that an act shall be done in no other manner or at no other time than that designated, or (2) a provision for a penalty or other consequence of noncompliance. [Citation omitted.]"

Neither of these factors applies to K.S.A. 21-4704(e)(1). The statute provides that the "sentencing judge shall select the center of the range *in the usual case.*" (Emphasis added.) K.S.A. 21-4704(e)(1). This caveat—"in the usual case"—indicates that a court is not *required* to enter the middle term in the sentencing range, but rather that such a sentence is *generally recommended.*

Finally, this court has explained that when interpreting statutes, courts must consider various provisions of an act in context with a

view of reconciling the statutes and bringing them into workable harmony if possible. *State v. Breedlove*, 285 Kan. 1006, Syl. ¶ 6, 179 P.3d 1115 (2008). The first sentence of K.S.A. 21-4704(e)(1) explicitly states that the "sentencing court has discretion to sentence at any place within the sentencing range." To interpret the second sentence—that the "sentencing judge shall select the center of the range in the usual case"—as requiring the judge to enter the middle sentence in every case in the absence of aggravating factors would effectively nullify the first sentence. The only way these two sentences can be read in harmony is if the second sentence is merely directory, recommending a particular course of action without requiring that course be followed in every case.

The decisions of this court reinforce this interpretation. For example, the court in *Gould* noted that "Gould's jury verdict 'authorized' a sentence of 31 to 34 months for each child abuse conviction." 271 Kan. at 410. The court was only concerned with Gould's sentence insofar as it exceeded the upper term of the presumptive range. If the law only permitted the middle-term sentence in the grid block without making additional findings as to aggravation, the court would have stated that the verdict authorized a sentence of 31 to 32 months.

Hence, we conclude K.S.A. 21-4704(e)(1) grants a judge discretion to sentence a criminal defendant to any term within the presumptive grid block, as determined by the conviction and the defendant's criminal history. The judge need not conduct any fact finding or state factors on the record. Consequently, the prescribed " 'statutory maximum' " sentence described by *Apprendi*, 530 U.S. at 490, is the upper term in the presumptive sentencing grid block. K.S.A. 21-4704(e)(1) is constitutional under the Sixth and Fourteenth Amendments to the United States Constitution and does not violate the holdings in *Apprendi* or *Cunningham*.

In this case, the upper term in the sentencing block for Johnson's convictions for attempted second-degree murder was 61 months. The judge sentenced him to 61 months' imprisonment for each conviction—sentences that were within the judge's discretion to impose. As a result, under K.S.A. 21-4721(c)(1), this court is without jurisdiction to consider Johnson's challenge to his presumptive

sentences even if those sentences are to the longest term in the presumptive grid block for his convictions. This portion of his appeal is dismissed.

### Attorney Fees

Finally, Johnson contends the sentencing judge erred by ordering him to reimburse BIDS for attorney fees without first considering his ability to pay and the financial burden the payment would impose.

At sentencing, the judge ordered: "Costs of the action are assessed to the defendant." The State acknowledges in its appellate brief that the court failed to make any findings on the record regarding Johnson's ability to pay BIDS attorney fees or the financial burden the payment would have on him.

In *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006), this court held: "A sentencing court assessing fees to reimburse [BIDS] under K.S.A. 2005 Supp. 22-4513 must consider on the record at the time of assessment the financial resources of the defendant and the nature of the burden that payment of the fees will impose." 281 Kan. 538, Syl. ¶ 1. Because the judge did not make these findings, the BIDS attorney fees imposed under K.S.A. 22-4513 must be vacated and the case must be remanded for consideration of Johnson's financial condition before such fees may be imposed under the statute.

Affirmed in part, dismissed in part, vacated in part, and remanded with directions.