NOT DESIGNATED FOR PUBLICATION

No. 113,612

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

BRADY A. BOOTON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Miami District Court; STEVEN C. MONTGOMERY, judge. Opinion filed August 5, 2016. Affirmed in part and dismissed in part.

*Caroline M. Zuschek*, of Kansas Appellant Defender Office, for appellant.

*Jason A. Oropeza*, assistant county attorney, *Elizabeth Sweeney-Reeder*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before LEBEN, P.J., STANDRIDGE and ARNOLD-BURGER, JJ.

*Per Curiam*:  Brady A. Booton appeals from his convictions of a single count of possession of methamphetamine, two counts of criminal possession of a firearm, and three counts of possession of drug paraphernalia. Finding no error, we affirm.

FACTS

On February 16, 2014, Paola police officers responded to a 911 call made by Tina Allen. When officers arrived at Allen's residence, they found her acting erratically and

scared. Allen told the officers that Booton had pulled a gun from his waistband, pointed it at her head, and threatened to kill her and her family. Allen described Booton's gun as a dark metallic gray Walther German .45 caliber pistol.

Law enforcement took Booton into custody after locating him at a residence owned by his grandmother, Carole Weers. Captain Kevin Colwell later went to Weers' home and obtained her consent to search the residence for the gun Allen had described. Weers directed Colwell to the room Booton occupied when he stayed with her. Inside a closet in that room, Colwell discovered a plastic Walmart bag. Inside the bag was a Crown Royal bag, a black canister, and a Ziploc bag of ammunition. The Crown Royal bag contained a digital scale, a roll of Ziploc bags, a wallet with Booton's driver's license inside, and a prescription pill bottle with Booton's name on it, which contained a substance later identified as methamphetamine. Inside the black canister, Colwell discovered more Ziploc bags and a glass pipe. Colwell did not find a gun during that visit. Two days later, however, Weers contacted Colwell and informed him that Booton had called from jail to tell her that there were two guns inside her house. Colwell returned to Weers' residence, where she directed him to an upstairs room that was used as a playroom for her grandchildren. Colwell observed a .22 caliber rifle and a 9-millimeter Walther P38 on the floor of the room. Weers told Colwell that she located the guns behind a mattress that was propped up against a wall in the room.

The State charged Booton with one count each of aggravated assault, criminal threat, and possession of methamphetamine; two counts of criminal possession of a firearm; and three counts of possession of drug paraphernalia. Before trial, Booton moved to suppress the drug evidence located in Weers' house on grounds that she lacked the authority to consent to the search of Booton's room and his personal belongings. After hearing evidence and argument from counsel, the district court denied the motion, finding Weers had apparent authority to consent to the search.

2

At trial, the jury found Booton not guilty of aggravated assault and criminal threat and guilty of possession of methamphetamine, two counts of criminal possession of a firearm, and three counts of possession of drug paraphernalia. The district court sentenced Booton to a controlling prison term of 60 months for the possession of methamphetamine and criminal possession of a firearm charges, consecutive to a controlling 24-month jail sentence for the possession of drug paraphernalia charges.

ANALYSIS

Booton raises the following issues on appeal: (1) The district court erred by denying his pretrial motion to suppress, (2) the district court erred by admitting a forensic report into evidence without testimony from the forensic scientist who prepared it, (3) his convictions for possession of drug paraphernalia were multiplicitous, (4) the evidence was insufficient to support one of his convictions for possession of drug paraphernalia, and (5) the district court erred by sentencing him to an aggravated presumptive sentence without requiring the State to prove the aggravating factors to a jury beyond a reasonable doubt. We address each issue in turn.

1. *Motion to suppress*

A district court's decision on a motion to suppress is reviewed by an appellate court using two steps. *City of Atwood v. Pianalto*, 301 Kan. 1008, 1012, 350 P.3d 1048 (2015). First, the appellate court reviews the district court's factual findings for substantial competent evidence, but it does so without reweighing the evidence, assessing witness credibility, or resolving conflicting evidence. Second, it exercises unlimited review over the district court's legal conclusions regarding the suppression of the evidence. 301 Kan. at 1012. The State bears the burden of proving to the district court the lawfulness of the search and seizure by a preponderance of the evidence. *State v. Garcia*, 250 Kan. 310, 318, 827 P.2d 727 (1992).

3

Generally, warrantless searches violate the prohibition against unreasonable searches under the Fourth Amendment to the United States Constitution; however, valid consent to a search provides an exception to the general rule. *State v. Udell*, 34 Kan. App. 2d 163, 165, 115 P.3d 176 (2005). In this case, the parties agree that Weers—Booton's grandmother—consented to the search. The only dispute is whether Weers had the requisite authority to do so.

The authority of a third party to consent to a search may stem from that party's actual authority to consent or that party's apparent authority to consent. A party's actual authority to consent exists when that person has either: "'(1) mutual use of the property by virtue of joint access; or (2) control for most purposes over it.'" *Udell*, 34 Kan. App. 2d at 165 (quoting *United States v. Rith*, 164 F.3d 1323, 1329 [10th Cir.], *cert. denied* 528 U.S. 827 [1999]). The underlying rationale for the authority of a third party to consent has been explained as follows:

> "'Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, . . . but rests rather on *mutual use of the property by persons generally having joint access or control for most purposes*, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his [or her] own right and that the others have assumed the risk that one of their number might permit the common area to be searched.'" *State v. Ratley*, 16 Kan. App. 2d 589, 591, 827 P.2d 78 (1992) (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 39 L. Ed. 2d 242 [1974]).

A party's apparent authority to consent to a search exists when all of the facts available to the officers at the time the consent was obtained would have led a person of reasonable caution to believe that the consenting person had actual authority over the premises to be searched, even if it turns out that actual authority was lacking. *State v. Kerestessy*, 44 Kan. App. 2d 127, Syl. ¶ 6, 233 P.3d 305 (2010).

In this case, the district court found Weers had apparent authority to consent to the search of Booton's personal belongings. But Booton claims the facts are insufficient to support the district court's legal conclusion in this regard. Specifically, Booton claims there is no evidence to support the court's finding that Weers had apparent authority to consent to a search of the bags and containers within the Walmart bag Colwell discovered in the closet. For the reasons stated below, we disagree.

The State presented the following testimony from Captain Colwell and Weers at the suppression hearing.

### a. *Captain Colwell*

Colwell testified that when he went to Weers' residence, she answered the door and invited him inside. Colwell explained to Weers that he was there because Booton had been involved in an alleged assault with a gun. He asked Weers how often Booton was at her home. Weers said Booton lived there "on and off, more off than on," and that Booton also sometimes stayed with his mother in Olathe. In response to Colwell's questions, Weers said she was not sure of Booton's permanent address, but she knew Booton's driver's license listed his mother's Olathe address and he received mail at the Olathe address. Colwell then explained that he wanted to search Weers' house for the gun that was used in the alleged assault and asked Weers if she would be willing to give him consent to conduct the search. Colwell provided Weers with a consent to search form, explained the form to her, and asked if she had any questions. At this point, Weers told Colwell that she owned the home, she did not want a gun in her house, she understood the form, and she consented to Colwell's search of the home. Weers then signed the form.

After Weers signed the form consenting to the search of her home, Colwell told Weers he wanted to start the search in an area where Booton would normally go as he entered the house. Weers took him to a room upstairs. The door to the room was open

5

and had no lock. Colwell described the room as being "a little bit in disarray." There was a mattress on the floor with a couch butted up against it. Colwell did not notice any personal belongings in the room and could not tell from the surroundings whether anyone was permanently staying in the room. The room contained a closet but the closet did not have a door. On the floor of the closet, Colwell saw a plastic Walmart bag. The bag was not locked or tied up. Inside the bag, Colwell discovered ammunition and a Crown Royal bag. Inside the Crown Royal bag, Colwell discovered a wallet, a prescription pill bottle with Booton's name, and drug paraphernalia. Inside the wallet, Colwell discovered Booton's driver's license. Colwell did a cursory check of the rest of the house and did not find any firearms.

b. *Carole Weers*

Weers testified that Booton had lived with her off and on since he was 15 years old and that she had been his unofficial guardian when he was a minor. Weers said Booton had most recently been staying with her for the 4 months prior to his arrest in this case. Booton did not pay Weers to rent the room he lived in, but he sometimes would bring things, like food. Weers did not allow her other grandchildren to play in Booton's room. Weers herself did not "mess around" in Booton's room because she "respected his privacy" but never felt her access to the room was limited in any way. Weers did not remember Booton ever telling her that she could not go into his room. Weers noted that she did Booton's laundry and went into the room to put away his clothes. Finally, Weers said she gave Colwell permission to search Booton's room and that this permission specifically included a search of the Walmart bag discovered in the closet.

Following this testimony, the State argued that Weers, as the owner of the house, had actual authority to consent to the search of the bags in Booton's closet. In the alternative, the State argued that Weers had apparent authority to consent to a search of the bags in the closet because all of the facts available to Colwell at the time the consent

6

was obtained would have led a person of reasonable caution to believe that Weers had actual authority over the Walmart and Crown Royal bags within the room. Conversely, Booton argued that Weers had neither actual nor apparent authority to consent to the search of his personal belongings because he had a reasonable expectation of privacy as a guest in Weers' home. After considering the evidence presented and the arguments of counsel, the district court denied Booton's motion to suppress. The court held Weers had apparent authority to consent to the search based on Colwell's reasonable belief that Weers possessed actual authority to consent to a search of Booton's room and the bags in the closet. The court did not address whether Weers had actual authority to consent to the search.

We agree with the decision of the district court. Specifically, we find the following facts give rise to the reasonability of Colwell's belief that Weers possessed actual authority to consent to a search of Booton's room and the bags in the closet: (1) Weers answered the door to the residence and invited Colwell inside, (2) Weers said she owned the house, (3) Weers told Colwell that she did not want a gun in her residence, (4) Weers signed the consent to search form, (5) Weers led Colwell to the room where she indicated Booton's belongings were located, (6) Booton's room was not locked or otherwise secured, (7) Weers told Colwell that she had access to the room, and (8) there was no door on the closet where the bag was discovered on the floor.

Although conceding—for purposes of making this argument only—that the facts set forth above may have established the necessary apparent authority for Weers to consent to a search of the room itself, Booton argues the facts wholly fail to establish a reasonable belief that Weers had authority to search his personal belongings located on the floor of the closet in his room, in which he had a greater expectation of privacy. We disagree.

7

The United States Supreme Court has made clear that people who enjoy joint access or control for most purposes over specific property can inspect that property on their own behalf as well as consent to the inspection of that property by others. This principle is grounded in the notion that a person who permits another to have access to and control over property necessarily assumes the risk that the other person will consent to inspection of the property by others. *Matlock*, 415 U.S. at 171 n.7. Consistent with these principles, Colwell reasonably believed that Weers had joint access to and control for most purposes over the home and its contents. Again, Weers owned the home and had not encumbered her prerogative as a homeowner by entering into any sort of contractual relationship with Booton. Equally important, nothing about the bags themselves put Colwell on notice that Booton claimed an exclusive privacy interest in them. The bags had no lock on them or, for that matter, anything else ostensibly designed to inhibit someone from opening them. The bags were found in plain view on the floor of a closet with no door in a room Weers had access to and control over, not squirreled away in some secretive place. No identifying information on the bags revealed who owned them, used them, or had access to them. Colwell did not know who left them there or who, if anyone, intended to come back for them. In fact, Colwell could have reasonably concluded that the Walmart and Crown Royal bags belonged to Weers.

Colwell's conduct is "'judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man [or woman] of reasonable caution in the belief"' that the consenting party had authority" to consent to the search? *Illinois v. Rodriguez*, 497 U.S. 177, 188, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]). Applying settled principles of apparent authority and based on the facts available to Colwell at the time of consent, we find it was reasonable for Colwell to believe that Weers had actual authority to consent to a search of the unlocked, unidentified, and unclaimed Walmart and Crown Royal bags found in plain view on the floor of the closet.

2. *The forensic report*

Booton argues the district court erred by allowing the State to introduce into evidence a forensic laboratory report identifying the presence of methamphetamine in his prescription pill bottle without requiring testimony from the forensic scientist who prepared the report. Booton asserts the court's error deprived him of his right to confrontation under the Sixth Amendment to the United States Constitution.

In response, the State argues Booton failed to properly preserve this issue for appeal. Specifically, the State claims that it provided proper notice of its intent to use the laboratory report under the "notice and demand" provisions of K.S.A. 2015 Supp. 22-3437 and that Booton failed to raise a timely objection to the introduction of the report after receiving this notice.

An appellate court exercises de novo review of a challenge to the adequacy of the legal basis of a district court's decision on admission or exclusion of evidence. *State v. Bowen*, 299 Kan. 339, 349, 323 P.3d 853 (2014). When the question of whether the district court complied with specific statutory requirements for admitting evidence requires interpretation of a statute, appellate review is also de novo. *State v. Stafford*, 296 Kan. 25, 47, 290 P.3d 562 (2012).

K.S.A. 2015 Supp. 22-3437(a)(1) allows for reports and certificates relating to forensic examinations to be admitted into evidence so long as they are prepared and attested by a law enforcement agency employee. A forensic certificate must be supported by a sworn declaration that contains information regarding the type of analysis performed, the result achieved, any conclusions reached based upon that result, as well as information relating to the employee's training or experience to perform the analysis and the type of equipment used. When properly executed, a certificate and the related report generally qualify as admissible evidence of the results of the forensic examination.

9

K.S.A. 2015 Supp. 22-3437(a)(2). A party who intends to proffer a forensic certificate and report at trial must notify any opposing party of such intent at least 21 days prior to trial. An opposing party is required to give notice of any objection to the admission of the certificate and report within 14 days of receiving notice of the intent to proffer. A failure to comply with this requirement constitutes a waiver of any objections to the admission of the certificate and report. K.S.A. 2015 Supp. 22-3437(a)(3). The time limitations set forth in K.S.A. 2015 Supp. 22-3437(a)(3) may be extended upon a showing of good cause.

The record in this case reflects that on December 22, 2014—21 days prior to trial—the State served notice of its intent to proffer as evidence a Kansas Bureau of Investigation (KBI) laboratory report and certificate of analysis detecting methamphetamine in Lab Item 1, a "plastic bag containing crystalline substance." The report was prepared and attested by Beth Royel, a forensic scientist. Booton concedes that he did not object within 14 days of receiving the State's notice but claims that he "effectively objected" to the State's proffer at a pretrial hearing and otherwise had good cause for not timely objecting.

The pretrial hearing to which Booton refers took place on December 19, 2014, when the parties convened for a pretrial conference. The prosecutor moved to endorse Royel as a witness, stating, "We have previously just endorsed KBI lab personnel, but since we are scheduled for trial, we need to have the specific name to the defendant." Defense counsel did not object, and the district court granted the State's motion. Later during the hearing, the prosecutor mentioned that Royel had been served with subpoenas in two other cases during Booton's scheduled trial dates. The prosecutor indicated that Booton could stipulate to the foundation of Royel's report but understood that "if he doesn't want to, I will need [Royel] here." Defense counsel did not respond to the prosecutor's statement and declined the district court's invitation to discuss the issue further.

10

Three days later, on December 22, 2014, the State filed its notice of intent to proffer as evidence the report and certificate, to which Booton did not object. The record reflects that on January 8, 2015, the State served a subpoena on Royel and a return on the subpoena was filed with the court. At trial, however, the State did not call Royel to testify; instead, during Colwell's direct examination, the State moved to introduce the lab report into evidence. Defense counsel objected, citing a lack of foundation due to the State's failure to call Royel as a witness. The district court overruled the objection given Booton's failure to timely object to the State's notice of intent to proffer the report and certificate. After the court overruled the objection, Colwell testified to the information contained in the report, and the report was ultimately admitted into evidence.

Booton challenges the court's decision to overrule his objection. In support of this challenge, Booton argues that his refusal to stipulate to the State's proffer at the December pretrial conference should be construed as a valid objection to the admission of the report. Booton also argues there was good cause to extend the time limit for lodging a valid objection because the State, by endorsing and subpoenaing Royel as a witness, gave the impression that it intended to call her to testify in person.

We are not persuaded by Booton's arguments. Our Supreme Court has described K.S.A. 22-3437(3) as a type of "'notice-and-demand'" statute which requires the prosecution "'to provide notice to the defendant of its intent to use an analyst's report as evidence at trial, after which the defendant is given a period of time in which he may object to the admission of the evidence absent the analyst's appearance live at trial.'" *State v. Laturner*, 289 Kan. 727, 736, 218 P.3d 23 (2009). Here, the State filed its notice of intent to proffer the report and certificate, thereby providing notice that Royel would not testify at trial. Booton did not file a timely objection or otherwise raise the issue prior to trial. Booton's suggestion that he effectively objected to the admission of the report at the December 19 hearing mischaracterizes the nature of the parties' discussion at the hearing. Following the prosecutor's statement that Booton could stipulate to the report's

11

foundation in lieu of calling Royel to testify, defense counsel made no definitive statement indicating Booton's position on stipulating to the report. Defense counsel's silence on the matter cannot be considered an objection to the report's admission. And the fact that the State later subpoenaed Royel—17 days after filing notice of its intent to proffer the report and certificate—did not relieve Booton of his affirmative duty under K.S.A. 2015 Supp. 22-3437(a)(3) to file an objection to the State's notice within 14 days. Because Booton did not timely object to the admission of the lab report in lieu of Royel's testimony, he waived any objection to the admission of the report at trial and has failed to establish good cause for extending the statutory time limit. The district court did not err in admitting the report into evidence.

3. *Multiplicity*

Booton was convicted of three separate counts of possession of drug paraphernalia based on his possession of a glass pipe, baggies, and a digital scale (counts IV, VII, and VIII). On appeal, Booton argues that these convictions were multiplicitous, in violation of the constitutional prohibition against double jeopardy. Although Booton concedes he did not raise this issue before the district court, he contends we may properly reach the merits of this issue because it involves a legal question arising on proved or admitted facts and because it is necessary to serve the ends of justice or prevent the denial of a fundamental right. Under these circumstances, it is appropriate to address the merits of Booton's claim. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014) (setting forth exceptions to general rule that new legal theory may not be asserted for first time on appeal).

Multiplicity is the charging of a single offense in several counts of a complaint. It offends the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights when the improper splitting of a single offense into multiple counts results in multiple punishments

12

following conviction on those counts. See *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006). Whether the counts charged are multiplicitous raises a question of law over which an appellate court exercises unlimited review. 281 Kan. at 462.

In *Schoonover*, the Kansas Supreme Court adopted a two-part test for evaluating claims of multiplicity. Initially, the reviewing court must determine whether the charges arise from the same illegal conduct. If so, the court must next consider whether the statutes defining the offenses establish a single offense or multiple offenses. 281 Kan. at 496.

a. *Same conduct*

To determine whether the charged offenses arose out of the same conduct, the reviewing court may consider several factors, including whether the offenses were committed at approximately the same time, whether the offenses were committed at the same location, whether a causal relationship between the offenses exists or whether there was an intervening act, and whether the offenses were motivated by some fresh impulse. *Schoonover*, 281 Kan. at 497.

It is clear in this case that Booton's three charges for possession of drug paraphernalia arose out of the same conduct. The charges were all based on the evidence Colwell seized from Booton's room on February 16, 2014. Each of the items was intended for the same purpose, and there is no evidence of an intervening act or fresh impulse motivating any of the charges.

b. *Multiple offenses*

Because Booton's convictions arose out of the same conduct, it is necessary to address the second part of the *Schoonover* analysis by considering whether the offenses

13

arising out of the same illegal conduct support different offenses or describe the same offense. If, as here, the charged offenses are based on a single statute, the court must consider whether the legislature intended to permit multiple charges under the statute or intended only a single unit of prosecution. 281 Kan. at 497-98. The unit of prosecution test analyzes "how the legislature has defined the scope of conduct composing one violation of a statute." *State v. Thompson*, 287 Kan. 238, 245, 200 P.3d 22 (2009). This test asks whether the legislature intended the defendant's conduct to constitute "'only one violation of the statute or to satisfy the definition of the statute several times over.'" 287 Kan. at 246. "Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each unit of prosecution." 287 Kan. at 245. "The determination of the appropriate unit of prosecution is not necessarily dependent upon whether there is a single physical action or a single victim. Rather, the key is the nature of the conduct proscribed." *Schoonover*, 281 Kan. at 472. Determining a statute's unit of prosecution involves the interpretation of statutory language, a question of law over which this court has unlimited review. *State v. Harris*, 284 Kan. 560, 572, 162 P.3d 28 (2007).

Booton's convictions each fell under K.S.A. 2015 Supp. 21-5709(b)(2), which provides: "It shall be unlawful for any person to use or possess with intent to use any drug paraphernalia to . . . store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body." The term "drug paraphernalia" is defined as

> "all equipment and materials of any kind which are used, or primarily intended or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance and in violation of this act." K.S.A. 2015 Supp. 21-5701(f).

14

Relevant to this case, the definition of drug paraphernalia specifically includes the items used to convict Booton. See K.S.A. 2015 Supp. 21-5701(f)(5) ("scales and balances used or intended for use in weighing or measuring controlled substances"); K.S.A. 2015 Supp. 21-5701(f)(9) ("bags . . . used or intended for use in packaging small quantities of controlled substances"); K.S.A. 2015 Supp. 21-5701(f)(12)(A) (objects such as glass pipes "used or primarily intended or designed for use in ingesting, inhaling or otherwise introducing" certain types of drugs into the human body).

In support of his multiplicity argument, Booton relies primarily on the Supreme Court's analysis in *Thompson*, 287 Kan. at 245-52. In *Thompson*, the defendant possessed several ingredients which were illegal under K.S.A. 65-7006, a statute that prohibited the possession of certain items with the intent to manufacture a controlled substance. The court in *Thompson* found it significant that the legislature had "failed to state whether possession of each item in the statute for a single manufacturing operation may be prosecuted separately." 287 Kan. at 251-52. Because it was unclear whether possession of each ingredient could be prosecuted separately, the court determined the rule of lenity required the statute to be interpreted in the defendant's favor. Thus, the court determined a single unit of prosecution existed, even if multiple illegal ingredients were possessed, if the defendant had the required intent and his or her conduct was unitary. 287 Kan. at 252.

Booton argues the same analysis applies here, suggesting that K.S.A. 2015 Supp. 21-5709(b)(2) allows for only a single unit of prosecution, even if that conduct involves possession of several items of contraband. Although the legislature could have provided that each item possessed constituted a separate violation of the statute, Booton notes the legislature did not do so. Booton claims his possession of multiple items of paraphernalia constituted only a single offense because the items were possessed with the same intent— to store, contain, or otherwise introduce drugs into his body. Thus, Booton claims this unitary intent forms a single unit of prosecution.

15

But Booton's reliance on *Thompson* is misplaced. K.S.A. 65-7006(a), the statute at issue in that case, stated: "It shall be unlawful for any person to possess ephedrine, pseudoephedrine, red phosphorus, lithium metal, sodium metal, iodine, anhydrous ammonia, pressurized immonia or phenylpropanolamine, or their salts, isomers or salts of isomers with the intent to use the product to manufacture a controlled substance." In contrast, K.S.A. 2015 Supp. 21-5709(b)(2) prohibits the "use or possess[ion] with intent to use *any* drug paraphernalia . . . ." (Emphasis added.) The legislature's use of the term "any" evidences an intent to permit multiple charges under the statute. See *State v. Hulsey*, No. 109,095, 2014 WL 4627486, at *11-12 (Kan. App. 2014) (unpublished opinion) (use of term "any" in statute criminalizing possession of child pornography supports separate convictions for multiple images), *rev. denied* 302 Kan. 1015 (2015); *State v. Odegbaro*, No. 108,493, 2014 WL 2589707, at *9 (Kan. App. 2014) (unpublished opinion) (use of term "any" in statute criminalizing making a false information supports separate convictions for multiple written instruments), *rev. denied* 302 Kan. 1018 (2015); *State v. Odell*, No. 105,311, 2013 WL 310335, at *8 (Kan. App. 2013) (unpublished opinion) (use of terms "any item" in statute criminalizing traffic in contraband in a correctional institution provides for multiple units of prosecution in cases involving multiple items of contraband).

The legislature's use of the term "any" in K.S.A. 2015 Supp. 21-5709(b)(2) leads us to conclude that the statute provides for multiple units of prosecution in cases involving the possession of multiple items of drug paraphernalia. See *Phillips*, 299 Kan. at 495 (when interpreting statute, appellate court must ascertain legislature's intent through statutory language it employs, giving common words their ordinary meanings). Booton was found to be in possession of three distinct items of drug paraphernalia that, by statutory definition, constitute separate offenses. Therefore, Booton's convictions for possession of drug paraphernalia were not multiplicitous.

16

4. *Sufficiency of the evidence*

Booton argues the evidence was insufficient to support his conviction of possession of drug paraphernalia based on his possession of a digital scale. Specifically, he contends the State presented no evidence that he used the scale to store or contain drugs or to introduce drugs into the human body.

When the sufficiency of the evidence is challenged in a criminal case, the appellate court reviews all the evidence in a light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, the appellate court generally will not reweigh the evidence or the credibility of witnesses. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014).

The State charged Booton in count VIII with unlawful possession of drug paraphernalia, contrary to K.S.A. 2015 Supp. 21-5709(b)(2). In order to establish this charge, the State was required to prove that Booton "possessed with the intent to use scales to store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance."

At trial, the State admitted the digital scale into evidence during Captain Colwell's direct testimony and then asked him to explain the purpose of the scale. Colwell testified, "A digital scale that's commonly used in weighing especially with other narcotics, weighing the narcotics, and then sometimes in sales, or just when you're purchasing, you want to make sure that you're getting the right amount. So those are used for that." When asked whether a scale would be utilized prior to someone actually using a drug, Colwell responded affirmatively.

17

Based on this testimony, Booton concedes the State presented sufficient evidence that he "had the scales in his possession for the purpose of weighing drugs before he consumed or sold them." He argues, however, that the State presented no evidence that Booton "used the scales for containing drugs, storing drugs, ingesting drugs, inhaling drugs, or otherwise introducing drugs into the human body." We are not persuaded by this argument.

By conceding he possessed the scales for the purpose of weighing the drugs before he consumed them, Booton also concedes he possessed the scales for the purpose of weighing the drugs before introducing them into the human body. But Booton argues this concession is meaningless because the State was required to prove that the scales were the actual mechanism or instrument by which he intended to introduce the drugs into his body, as opposed to an mechanism or instrument he intended to facilitate that introduction; *i.e.*, weighing the drug prior to ingesting it in order to determine the desired dosage. But Booton's argument is not supported by the language of the statute. Relevant to the facts here, the State was required to prove that Booton possessed with the intent to use scales to introduce into the human body a controlled substance. K.S.A. 2015 Supp. 21-5709(b)(2). There is no statutory requirement that the scales be the actual mechanism or instrument to facilitate introduction of the controlled substance into the human body; only that the defendant possess the scales with the intent to use them to introduce a controlled substance into the human body.

The State presented sufficient evidence to show that a scale may be used for the purpose of introducing a controlled substance into the human body. Even if the scale itself was not actually used to inject, ingest, or inhale a controlled substance, viewed in the light most favorable to the State, a rational factfinder could have found that Booton used or intended to use the scale to introduce a controlled substance into his body by weighing the substance prior to ingesting it. See *State v. Jackson*, 49 Kan. App. 2d 116, 141, 305 P.3d 685 (2013) (rejecting similar argument where officer testified scales are

18

utilized by drug users to make sure they have received quantity of drugs for which they paid), *rev. denied* 299 Kan. 1272 (2014). And in fact, Colwell specifically testified that based on his experience, a scale like the one he found in Booton's closet is used before someone actually uses a drug. We find sufficient evidence supports this conviction.

5. *Aggravated presumptive sentence*

In his last issue on appeal, Booton challenges the decision of the district court to impose the aggravated penalty within the applicable sentencing grid for his possession of methamphetamine and criminal possession of a firearm convictions. He contends these sentences constituted an enhancement of the applicable penalty without a jury finding beyond a reasonable doubt, which violated his right to due process as interpreted by the United States Supreme Court in *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Although Booton did not raise this issue before the district court, Kansas appellate courts have addressed *Apprendi* claims for the first time on appeal. See *State v. Gould*, 271 Kan. 394, 404-05, 23 P.3d 801 (2001) (applying the holding of *Apprendi* to declare Kansas' upward sentencing departure procedure unconstitutional based on issue raised for first time on appeal). Our Supreme Court concluded in *State v. Johnson*, 286 Kan. 824, Syl. ¶ 5, 190 P.3d 207 (2008), however, that a sentence that falls within the range of a presumptive grid block in the Kansas sentencing guidelines does not violate *Cunningham* or *Apprendi*. The *Johnson* court further explained that under K.S.A. 21-4721(c)(1), appellate courts lack jurisdiction to review any individual presumptive sentence. 286 Kan. at 851-52; see *State v. Hilt*, 299 Kan. 176, 201, 322 P.3d 367 (2014) (reaffirming *Johnson*). Accordingly, because Booton's sentences for possession of methamphetamine and criminal possession of a firearm fell within the presumptive sentencing range, we are without jurisdiction under K.S.A. 2015 Supp. 21-6820(c)(1) (formerly K.S.A. 21-

19

4721[c][1]) to consider the district court's imposition of the higher term. As a result, this issue must be dismissed. See *Johnson*, 286 Kan. at 851-52.

Affirmed in part and dismissed in part.